IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:15-HC-2009-FL

| | |
|---|---|
| TODD JOSEPH MARTIN, | ) |
| | ) |
|     Petitioner, | ) |
| | ) |
|     v. | )     ORDER |
| | ) |
| ERIC A. HOOKS, Secretary of | ) |
| Department of Public Safety, and | ) |
| HUBERT CORPENING, Administrator | ) |
| of Marion Correctional Institution, | ) |
| | ) |
|     Respondents.[1] | ) |

The matter comes before the court on respondents' motion to exceed the page limitation for their brief, (DE 42), as well as the parties' cross-motions for summary judgment, pursuant to Federal Rule of Civil Procedure 56(a). (DE 39, 45). The issues raised have been fully briefed, and in this posture are ripe for ruling. For the reasons that follow, respondents' motion to exceed the page limitation is granted. Respondents' motion for summary judgment is granted, and petitioner's motion for the same is denied.

**STATEMENT OF THE CASE**

On November 2, 2009, defendant was found guilty of assault by strangulation against his then-wife Mary,[2] based on incidents that occurred August 19, 2008. Mistrial was declared as to the remaining charges before the jury, including first-degree kidnapping, attempted murder, first-

---

[1]     The court AMENDS the case caption to reflect the parties named in petitioner's petition under 28 U.S.C. § 2254 for writ of habeas corpus by a person in state custody, filed February 5, 2019. (DE 34).

[2]     The court uses a pseudonym to protect the victim's identity.

degree rape, two counts of first-degree sexual offense. The case came on for trial again on January 3, 2011. Petitioner was represented by a new attorney, Philip Clarke, III ("trial counsel"), after his original attorney withdrew.

On January 7, 2011, the jury returned not guilty verdicts for the charges of attempted murder and first-degree rape. The jury found petitioner guilty of first-degree kidnapping, first-degree sexual offense (fellatio), and second-degree sexual offense (anal intercourse). Petitioner was sentenced to a minimum term of 100 months to a maximum term of 129 months' imprisonment for second-degree sexual offense and 288 to 355 months' imprisonment for first-degree sexual offense, sentences to run consecutively. The North Carolina Court of Appeals vacated petitioner's first-degree kidnapping conviction, but upheld petitioner's convictions for second-degree sexual offense and first-degree sexual offense. State v. Martin, 222 N.C. App. 213, 218–22 (2012). Thereafter, the North Carolina Supreme Court denied petitioner's request for discretionary review. State v. Martin, 366 N.C. 413 (2012).

On March 10, 2014, petitioner, acting through counsel, filed a motion for appropriate relief ("MAR") in Carteret County Superior Court. Without holding evidentiary hearing, the superior court denied the MAR on December 4, 2014. Petitioner commenced the instant federal action on January 22, 2015, and requested a stay pending state appellate review of his MAR. The North Carolina Court of Appeals reversed the state trial court's denial of the MAR, concluding that petitioner's motion for appropriate relief could not be resolved solely on the basis of the record and directing the state trial court conduct an evidentiary hearing. State v. Martin, 244 N.C. App. 727, 738 (2016).

On May 8 and 9, 2017, the state trial court conducted evidentiary hearing on petitioner's MAR. After receiving testimony and exhibits from the parties, the state trial court denied

petitioner's MAR on the merits by order entered October 10, 2017. Discretionary review was denied by the North Carolina Court of Appeals on February 26, 2018, and by the North Carolina Supreme Court on October 2, 2018.

The court lifted the stay of this action on October 9, 2018, and granted petitioner's request to file amended petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254. Petitioner filed amended petition on February 5, 2019, which raises two grounds for relief: 1) his trial counsel failed to provide him constitutionally effective assistance, and 2) the government violated its constitutional duty to disclose exculpatory or impeachment evidence. In support of the petition, petitioner attached numerous exhibits (see DE 34-2), as well as the transcripts of his MAR hearing ("MAR Tr." (DE 34-3)), second trial ("Second Trial Tr." (DE 34-4)), and first trial ("First Trial Tr." (DE 34-5)).

Respondents filed their instant motions on March 22, 2019, relying upon prior orders entered by the state trial court and state appellate courts, the records on appeal, the judgments entered in the state proceedings, motions, and other briefing by the parties. Petitioner cross-moved for summary judgment on April 12, 2019, relying upon the record before the court.

## STATEMENT OF THE FACTS

In its opinion directing the state trial court to conduct an evidentiary hearing on petitioner's MAR, the North Carolina Court of Appeals summarized the factual background as follows:

> In 2008, Defendant and Mary separated but Defendant remained actively involved with the couple's two children who remained in the family home with Mary. According to Mary's testimony, during the evening of 18 August 2008, Defendant ate with her and the children and helped get them ready for bed. After that, Defendant left to go to work. Mary denied that Defendant was planning on returning to the home that night to sleep on the sofa. During the early morning hours, Mary awoke and noticed that her television, which she generally kept on, was off and saw her husband lying on the floor beside her bed, naked and sleeping. Mary began yelling at him that he had to leave. Defendant then climbed on top of her, removed her shorts, and start[ed] penetrating her vaginally.

3

Mary further testified that Defendant took her cell phone away and handcuffed her to the bed using a set of novelty handcuffs from his nightstand. Mary denied that she and Defendant had used the handcuffs before but acknowledged that they kept other novelty items in the top drawer of the nightstand. She was able to release the handcuffs, but once Defendant realized that she had done so, he stood on the bed, pulled her up by her hair, and forced his penis into her mouth. He flipped her onto her stomach after she tried to pull away and put her in a choke hold. He told her that he would kill her and "put [her] in a pond" near the house. Eventually, Mary lost consciousness. During cross-examination, Mary claimed that she was screaming and yelling during the entire incident prior to losing consciousness.

When Mary woke up, Defendant was penetrating her anally, and she was lying in a pool of urine on the bed. Mary testified that when Defendant was "ready to finish," he pulled her up and ejaculated in her mouth. Defendant laid on the bed and eventually fell asleep. Before he fell asleep, Defendant told Mary that he had been at a bar that night using cocaine and had planned to kill himself with a gun he kept in his truck. After Defendant was asleep, Mary found her car keys, grabbed her two children, and ran out the front door.

Mary drove to her friend Ashley Lawson's ("Ashley's") house. Mary told Ashley that Defendant had tried to kill her. Ashley called the police. Eventually, Ashley went with Mary to Carteret General Hospital where Mary worked part-time as a nurse. In the emergency room, Mary met with Sheila Martin ("Sheila"), a sexual assault nurse examiner ("SANE"), who examined Mary. Mary had been one of Sheila's students when Sheila was teaching part-time in a LPN program at the local community college. Sheila took several swabs from Mary's mouth, vagina, and anus.

At trial, Sheila testified that after Mary told her the details of the assault, Sheila conducted a head-to-toe exam. She noted petechiae—red or purple marks on the skin caused by bleeding into the skin from broken capillaries—all over Mary's face. She also noticed a mark on Mary's neck, circumferential marks on her wrists, and a small tear in the top of her mouth. Sheila also conducted a pelvic exam and noticed no bruising or tears in Mary's vaginal or rectal area. She testified that this was not uncommon and that, in many cases of rape, there is no tearing or bruising. In other words, according to Sheila, the absence of tearing or bruising does not necessarily mean that sex was consensual. Sheila noticed some blood in Mary's cervical os, an opening between the cervix and the uterus.

Mary also testified at trial about a prior incident in March 2008 when Defendant attempted to rape her but she was able to talk him out of it on that occasion, and about two other incidents, in the spring or fall of 2006 and in January or February in 2007, when Defendant had had sex with her against her will. After the incident in March 2008, Mary called the police, and Officer Horst with the Newport Police Department responded. After that incident, Mary claimed that she and Defendant began attending counseling.

4

Jessica Posto, a forensic biologist with the State Bureau of Investigation, ("Ms. Posto") testified at trial regarding the testing of evidence obtained from the sexual assault evidence collection kit used at the hospital and from clothing Mary was wearing the night of 18 August 2008. Ms. Posto found sperm on Mary's tank top, but vaginal, rectal, and oral swabs came back negative for semen. The vaginal swab tested positive for blood.

The only testimony defense counsel offered to rebut the State's medical evidence was that of Brent Turvey ("Mr. Turvey"). Mr. Turvey was a forensic scientist hired by the defense to explain "why evidence is, what it means, what it does not mean, very often what can be done with the evidence, [and] what hasn't been doing with the evidence." In his affidavit attached in support of Defendant's MAR, Mr. Clarke refers to Mr. Turvey as an expert in "rape investigations." However, Mr. Turvey does not have a medical background. During voir dire, outside the presence of the jury, Mr. Turvey claimed to have performed forensic examinations of sexual assaults for court purposes, including crime reconstruction and examinations of the physical evidence. Mr. Turvey stated that he had been asked to look at the physical evidence in this case to determine whether it supported Mary's version of the events. During his lengthy voir dire, Mr. Turvey testified that the physical evidence was inconsistent with the alleged version of events leading up to the sexual assault, the physical evidence was inconsistent with Mary's version of the sexual assault, and there was evidence that Mary was making false sexual assault allegations that the police failed to further investigate. Mr. Turvey attempted to testify several times about the SANE's findings, but Judge Alford stopped his testimony, noting that Mr. Turvey did not have a medical degree.

After voir dire, Judge Alford excluded Mr. Turvey's testimony, noting that:

the Court has heard the testimony of Mr. Turvey, has reviewed his curriculum vitae. He has, the Court has reviewed his forensic examination, and from all of that this Court can only conclude that the defendant seeks through Mr. Turvey to offer certain opinions about the investigation that was done in this case about which expert testimony is not needed. He also seeks in his opinions to invade the province of the jury. He also seeks to offer opinions on the evidence involving the credibility of certain witnesses and other evidence, which is totally, totally within the province of the jury; and we don't need expert testimony to show inconsistencies in the evidence, and as such and for other reasons, this Court will not permit the admission of that testimony or his admission as an expert witness.

Judge Alford acknowledged that "inconsistencies" existed in this case but that "nobody needs an expert to show[ ] those inconsistencies."

Defendant, who testified on his own behalf at trial, admitted engaging in sex with Mary, but claimed that it was consensual and that nothing the couple did that night was "new." According to Defendant, after engaging in consensual sex, Mary began asking him about other women. Defendant admitted to her that he had been talking to another woman and that he was planning to see her. Defendant refused to identify

the woman because it would "confirm [Mary's] suspicions." Mary became very upset and started threatening Defendant about his job and the children. Mary tried to kick him out of the house, and Defendant admitted that he placed her in a chokehold. After he released her, Defendant told her that "if [she] keep[s] fucking around [he'll] put [her] ass in that pond." Mary went to the bathroom and noticed how red her eyes were from being placed in the chokehold. Eventually, Defendant fell asleep. When he woke around 5:15 a.m., he noticed that Mary and the children were gone. Defendant called Mary's phone and knew, based on the background noises, that she was at the hospital. He drove to the hospital to try and see her, but he was refused access. Defendant was arrested later that same day.

State v. Martin, 244 N.C. App. 727, 728–31 (2016). Additional facts pertinent to the instant motions will be discussed below.

## COURT'S DISCUSSION

A.     Respondents' Motion for Leave to Exceed Page Limitation

Respondents request permission to exceed the page limitation for their memorandum in support of their motion for summary judgment. For good cause shown, the motion for leave is GRANTED.

B.     Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 250.

The standard of review for habeas petitions brought by state inmates, where the claims have been adjudicated on the merits in the state court, is set forth in 28 U.S.C. § 2254(d). That statute states that habeas relief cannot be granted in cases where a state court considered a claim on its merits unless the decision was contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court, or the state court decision was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d)(1) and (2). A state court decision is "contrary to" Supreme Court precedent if it either arrives at "a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to that of the Supreme Court. Williams v. Taylor, 529 U.S. 362, 406 (2000). A state court decision "involves an unreasonable application" of Supreme Court law "if the state court identifies the correct governing legal principle from [the Supreme] Court's cases but unreasonably applies it to the facts of the state prisoner's case." Id. at 407; see White v. Woodall, 134 S. Ct. 1697, 1702–07 (2014); Nevada v. Jackson, 133 S. Ct. 1990, 1992 (2013) (per curiam). A state court decision also may apply Supreme Court law unreasonably if it extends existing Supreme Court precedent to a new context where it does not apply, or unreasonably refuses to extend existing precedent to a new context where it should apply. Id. The applicable statute

> does not require that a state court cite to federal law in order for a federal court to determine whether the state court's decision is an objectively reasonable one, nor does it require a federal habeas court to offer an independent opinion as to whether it believes, based upon its own reading of the controlling Supreme Court precedents, that the [petitioner's] constitutional rights were violated during the state court proceedings.

Bell v. Jarvis, 236 F.3d 149, 160 (4th Cir. 2000), cert. denied, 534 U.S. 830 (2001). Moreover, a determination of a factual issue made by a state court is presumed correct, unless rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).

Congress intended the standard in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") to be difficult to meet. See White, 134 S. Ct. at 1702 (2014); Harrington, 562 U.S. at 102. "Section 2254(d) is part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions." Harrington, 562 U.S. at 103. To prevail in an action brought under section 2254(d), a petitioner must show that "there was no reasonable basis for the state court to deny relief." Id. at 784; see DeCastro v. Branker, 642 F.3d 442, 449 (4th Cir. 2011).

C. Analysis

1. Petitioner's First Trial

At petitioner's first trial, Mary testified that petitioner placed his hands around her throat, and that he squeezed her throat. (First Trial Tr. (DE 34-5) 56:14–17, 57:1–3, 59:23–60:3, 60:11–14, 66:5–11). Petitioner admitted that he put his arm around Mary's neck and choked her. (First Trial Tr. (DE 34-5) 546:10–547:6). The only verdict reached by the jury was that petitioner was guilty of assault by strangulation. See Martin, 222 N.C. App. at 214. As to this one verdict, the court dismisses any claim for ineffective assistance of counsel or the government's failure to disclose evidence. Where petitioner admitted to choking Mary, petitioner fails to show any reasonable probability that the verdict reached in the first trial would be different. The remainder of the court's analysis focuses on petitioner's second trial.

2. Ineffective Assistance of Counsel

In order to establish ineffective assistance of counsel, a petitioner must satisfy a two-pronged test. See Strickland v. Washington, 466 U.S. 688, 687 (1984). Under the first prong, a petitioner must show that his counsel's representation "fell below an objective standard of reasonableness." Id. at 688. The court must be "highly deferential" to counsel's performance and

8

must make every effort to "eliminate the distorting effects of hindsight." Id. at 689. Therefore, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. The second prong requires a petitioner to prove that he was prejudiced by the ineffective assistance by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

Petitioner raises numerous claims of ineffective assistance of counsel. Following an evidentiary hearing on petitioner's MAR, the state court adjudicated these claims and denied them on the merits in a detailed order. (See Order Denying MAR (DE 41-18)). For the reasons set forth below, the state court's resolution of the ineffective assistance of counsel claims was not contrary to or an unreasonable application of clearly established federal law, and did not represent an unreasonable determination of the facts.

First, petitioner contends that counsel was ineffective when he failed to cross-examine Mary about reporting to officers that petitioner used two pairs of handcuffs instead of one. However, two pairs of handcuffs were identified and listed as an exhibit at trial. (Second Trial Tr. (DE 34-4) 258:18–259:13). Petitioner admitted restraining Mary with handcuffs. (Second Trial Tr. (DE 34-4) 534:10–11). Moreover, counsel cross-examined Mary in detail regarding the handcuffs at trial, including whether petitioner used one pair of handcuffs or two. (Second Trial Tr. (DE 34-4) 113:22–120:21). On such facts, the state court did not unreasonably determine that trial counsel's failure to cross-examine Mary about the number of pairs of handcuffs she reported to the officers failed to show the prejudice component of an ineffective assistance of counsel claim.

Second, petitioner contends that counsel was ineffective because he failed to cross-examine Mary about whether petitioner digitally penetrated her. However, trial counsel did cross-examine

9

Mary regarding the issue of digital penetration, to which she responded that she did not recall. (Second Trial Tr. (DE 34-4) 153:5–11). Such an answer is not inconsistent with an earlier statement in the SANE report that petitioner did digitally penetrate Mary. From this testimony, the state court reasonably concluded that, "at best, [counsel] could have only refreshed her recollection with the [report], and no evidence was presented whether such recollection would have produced a different response from the witness." (Order Denying MAR (DE 41-18) at 8). The state court did not unreasonably determine that petitioner failed to show ineffective assistance of counsel based on this claim.

Third, petitioner contends that counsel was ineffective because he did not cross-examine Mary regarding her statements that she was yelling or screaming throughout the sexual assault. (Second Trial Tr. (DE 34-4) 109:24–110:10). Petitioner specifically relies upon testimony from his first trial, where Sheila testified that Mary said she did not scream or fight because she did not want to wake the children. (First Trial Tr. (DE 34-5) 470:8–15). However, upon refreshing her recollection further, Sheila clarified that "<u>she stated she started screaming</u> and he said he would kill her and she did not scream or fight because she had a three year old and a nine month old asleep in the house." (First Trial Tr. (DE 34-5) 470:21–471:5 (emphasis added)). The evidence at trial also included a written statement by Ashley that Mary's three-year-old daughter said she "heard mommy screaming help in her pillow." (Ashley Lawson Statement (DE 34-2) at 71). Where the record of the first trial demonstrates Mary testified that she was screaming, the state court reasonably determined that failing to bring out these minor inconsistencies did not prejudice petitioner.

Fourth, petitioner contends that counsel failed to explicitly cross-examine Officer Horst if he heard screams coming from the victim's home during the early morning hours. Horst testified

10

that he had arrived during the early morning hours of the day of the assault to respond to a breaking and entering down the street. (Second Trial Tr. (DE 34-4) 230:19–231:6). On direct examination, when asked if he noticed anything about the Martin residence, Horst did not comment that he heard screaming, but said that petitioner's truck was there. (Second Trial Tr. (DE 34-4) 231:7–11). Earlier during the trial, counsel also elicited that the walls in the Martin residence were thin and that Mary and petitioner could easily hear her neighbors. (Second Trial Tr. (DE 34-4) 175:17–176:5). Therefore, trial counsel elicited sufficient facts for the jury to infer that Horst did not hear Mary screaming, even though he did not expressly ask Horst if he heard anything.

Fifth, petitioner contends that trial counsel's assistance was ineffective because he did not cross-examine Mary regarding her statements that petitioner might have had scratches, or otherwise elicit testimony from other witnesses that petitioner did not have scratches or bruises. (First Trial Tr. (DE 34-5) 306:4–7, 350:3–5, 622:14–17; Second Trial Tr. (DE 34-4) 108:21–109:7). However, trial counsel did elicit uncontradicted testimony from petitioner that he undressed for the nurse, was examined, and there were no bruises, scratches or marks. (Second Trial Tr. (DE 34-4) 554:20–555:5). While additional cross-examination of Mary or direct testimony from third-party witnesses concerning the absence of scratches or bruising may have bolstered petitioner's credibility, when considered against the evidence as a whole, petitioner has not established a reasonable probability of a different result or that counsel's performance fell below an objective standard of reasonableness as to this claim.

Sixth, petitioner contends that trial counsel was ineffective because he did not introduce any evidence that police did not locate a gun in petitioner's residence, truck, or anywhere else. (See First Trial Tr. (DE 34-5) 353:4–7). Petitioner suggests that such evidence would refute Mary's testimony that petitioner told Mary he had a gun in his truck and was going to kill himself.

11

(Second Trial Tr. (DE 34-4) 56:4–7). However, counsel cross-examined Mary about whether she knew petitioner had a gun at the time, and she said she did not know. (Second Trial Tr. (DE 34-4) 144:3–5). Whether the police found a gun does not have a reasonable probability of undermining the jury's verdicts, where it has no relevance to whether petitioner said he had a gun.

Seventh, petitioner contends that trial counsel was ineffective because he did not introduce evidence that Mary's daughter urinated everywhere to explain why Mary's friends testified that Mary smelled like urine upon fleeing from her house. (See First Trial Tr. (DE 34-5) 71:3–14; Second Trial Tr. (DE 34-4) 318:16–20, 332:12–15). Petitioner contends that such evidence would have shown that Mary could have smelled like urine without urinating on herself. Failure to introduce such evidence did not prejudice petitioner. Mary testified in both trials that, after being placed in a choke hold and rendered unconscious, she regained consciousness and was lying in a pool of her own urine while petitioner penetrated her. (First Trial Tr. (DE 34-5) 66:5–24, Second Trial Tr. (DE 34-4) 52:17–53:3). Trial counsel questioned Mary's memory, such as how long she thought she was unconscious and whether the urine was warm. (Second Trial Tr. (DE 34-4) 125:14–127:6). Petitioner testified that there was no urine on the bed. (Second Trial Tr. (DE 34-4) 592:4–25). Moreover, while investigating the crime scene, Horst noticed a large wet spot on the victim's bed and determined by smell that it was urine. (Second Trial Tr. (DE 34-4) 233:1–8). Later, trial counsel elicited from Detective Fuller, the lead investigator in the case, that the victim's sheets were never sent to the crime lab to be tested for sources of urine. (Second Trial Tr. (DE 34-4) 273:2–274:8). In sum, trial counsel put the existence or source of any urine on the bed at issue, and the jury nonetheless convicted. The inference that petitioner suggests — that because Mary's daughter urinated everywhere, Mary's account as to the source of the urine on her body and on the bed is unreliable — is speculative. Thus, the state court's ruling that petitioner was not prejudiced

by failure to introduce evidence that Mary's daughter "peed everywhere" is not an unreasonable application of controlling law.

Eighth, petitioner argues that trial counsel failed to elicit evidence that Mary's last period was 34–35 days prior to being examined by Sheila on the date of the incident, so any blood taken from the cervical area during a vaginal swab could have been due to a menstrual period. (See First Trial Tr. (DE 34-5) 469:24–470:7). Petitioner contends this would have undercut the probative value of Sheila's testimony regarding presence of a small blood streak in the cervical area. (See Second Trial Tr. (DE 34-4) 397:24–398:11). However, Sheila testified that she did not find any vaginal injury in the instant case, but that absence of injury does not indicate whether sexual activity was consensual or nonconsensual. (Second Trial Tr. (DE 34-4) 412:1–16, 420:20–421:6). Moreover, on cross-examination of the government's serologist, trial counsel did elicit that there is no way to tell from a vaginal swab if the blood is menstrual or from some other source. (Second Trial Tr. (DE 34-4) 192:1–14). Thus, the state court did not unreasonably determine that failure to question Sheila regarding the date of Mary's last period was not prejudicial.

The court turns to whether, viewing petitioner's sub-contentions cumulatively, petitioner was prejudiced. See Williams v. Taylor, 529 U.S. 362, 399 (2000). As discussed above, each piece of evidence that petitioner claims trial counsel failed to introduce either 1) was introduced by other means, or 2) was of scant, if any, significance in light of the evidence adduced at trial. Considering the evidence cumulatively does not alter the court's conclusion. Furthermore, the record demonstrates that trial counsel vigorously cross-examined witnesses throughout the trial, marshaled the evidence for petitioner's defense, and successfully secured petitioner's acquittal on the charges of attempted first-degree murder and first-degree rape, the most serious felonies charged in the case. In sum, petitioner's efforts to mine the record for trial counsel's missed

13

opportunities to present additional evidence ring hollow. The state court's decision denying motion for appropriate relief was not unreasonable under Strickland and its progeny.

3. Failure to Disclose Evidence

"The Due Process Clause requires the prosecution to disclose upon request evidence that is favorable to the defense and material to guilt or punishment." United States v. Sterling, 724 F.3d 482, 511 (4th Cir. 2013) (citing United States v. Higgs, 663 F.3d 726, 734–35 (4th Cir.2011)). Evidence is favorable if it is exculpatory, Brady v. Maryland, 373 U.S. 83 (1963), or if it may be used for impeachment, Giglio v. United States, 405 U.S. 150 (1972). "The government breaches its duty if it fails to produce evidence that it is obligated to turn over to the defense, or if it fails to timely comply with a discovery order in turning over required evidence." Sterling, 724 F.3d at 511. "A failure to disclose violates due process only if the evidence in question (1) is favorable to the defendant because it is either exculpatory or impeaching; (2) was suppressed by the government; and (3) is material in that its suppression prejudiced the defendant." Id. (citing Strickler v. Greene, 527 U.S. 263, 281–82 (1999); Vinson v. True, 436 F.3d 412, 420 (4th Cir. 2006)). Undisclosed evidence is material when its cumulative effect is such that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 433–34 (1995) (internal quotation marks and citation omitted). A reasonable probability is one sufficient to undermine confidence in the outcome. Id. at 434.

Petitioner contends that the government impermissibly withheld evidence that it received knives that he allegedly used to threaten Mary from Mary's domestic attorney. Petitioner further contends that trial counsel would have used this evidence to impeach Mary's credibility and bolster

14

petitioner's theory that Mary fabricated the sexual assault allegations in order to secure a divorce and full custody of her children and remove petitioner from their lives.

Trial counsel elicited on cross-examination of Mary that petitioner never threatened Mary with any knives, and petitioner never showed Mary any knives. (MAR Tr. (DE 34-3) 120:1–22; Second Trial Tr. (DE 34-4) 132:8–20). Trial counsel further elicited the fact that Mary signed a complaint for domestic violence protection order which said petitioner "brought knives into the room" on the night of the incident. (Second Trial Tr. (DE 34-4) 138:2–139:5). When asked if the allegation written in the complaint for domestic violence protection order was true, Mary said "I don't recall saying that he brought knives into the room, the knives were found in the bathroom by the police officers." (Second Trial Tr. (DE 34-4) 139:9–12). Trial counsel then proceeded to question Mary extensively regarding the allegations in her domestic violence complaint and the outcome of the proceeding. (See Second Trial Tr. (DE 34-4) 139:13–147:14).

In light of the evidence discussed above, the state court's decision denying motion for appropriate relief does not involve an unreasonable application of Supreme Court precedent.[3] In pertinent part, the state court explained:

> The defendant's MAR constructs an inference-upon-inference ladder to allege such a result: if the source information [regarding the knives] had been known, counsel might have cross-examined the victim differently, and the victim's credibility might have been impeached, and the level of that impeachment might have undermined her remaining testimony, and such undermining of her credibility might have made a difference to the jury. The Court concludes that defendant has not met the heavy burden of proving each of these inferences, and therefore a constitutional violation.

(Order Denying MAR (DE 41-18) at 16).

---

[3] Petitioner does not argue that that the state court employed an erroneous materiality standard under Kyles.

Any evidence as to how the police came into possession of the knives would not materially advance counsel's fabrication theory. Trial counsel already elicited on cross-examination Mary's testimony that petitioner never threatened her with knives, that Mary pursued a domestic violence complaint alleging petitioner threatened her with knives, and that Mary obtained the relief she sought in the domestic violence proceeding. Thus, the state court's application of Giglio and its progeny was not unreasonable.[4]

D.      Certificate of Appealability

Rule 11 of the Rules Governing Section 2254 Cases ("Habeas Rules") provides "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Having determined petitioner is not entitled to relief and respondent is entitled to dismissal of the petition, the court considers whether petitioner is nonetheless entitled to a certificate of appealability with respect to one or more of the issues presented in his habeas petition.

A certificate of appealability may issue only upon a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The petitioner must demonstrate that reasonable jurists could debate whether the issues presented should have been decided differently or that they are adequate to deserve encouragement to proceed further. Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003); Slack v. McDaniel, 529 U.S. 473, 484 (2000).

After reviewing the claims presented in the habeas petition in light of the applicable standard, the court finds reasonable jurists would not find the court's treatment of any of petitioner's claims debatable or wrong and none of the issues are adequate to deserve encouragement to proceed further. Accordingly, a certificate of appealability is denied.

---

[4] Where the state court's decision regarding materiality survives scrutiny, the court does not reach petitioner's argument that the state court based its decision in part on the fact that the prosecution's failure to provide evidence was not willful.

## CONCLUSION

Based on the foregoing, respondents' motion to exceed the page limitation (DE 42) is GRANTED. Respondents' motion for summary judgment (DE 39) is GRANTED, and petitioner's motion for the same (DE 45) is DENIED. Petitioner's petition for writ of habeas corpus under 28 U.S.C. § 2254 (DE 34) is DISMISSED. A certificate of appealability is DENIED. The clerk is DIRECTED to close this case.

SO ORDERED, this the 30th day of March, 2020.

LOUISE W. FLANAGAN
United States District Judge